**Entered on Docket**
**August 11, 2015**
**EDWARD J. EMMONS, CLERK**
**U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

Signed and Filed: August 11, 2015



_____
**DENNIS MONTALI**
**U.S. Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | ) Bankruptcy Case |
| | ) No. 11-31376DM |
| HOWREY LLP, | ) |
| | ) Chapter 11 |
| | ) |
| Debtor. | ) |
| _____ | ) |

MEMORANDUM DECISION ON OBJECTIONS
TO LANDLORDS' CLAIMS

## I. INTRODUCTION

On a question of apparent first impression, the court must decide whether claims of landlords for unpaid rent accruing during the interval between the filing of an involuntary petition and the order for relief are entitled to priority under the Bankruptcy Code. For the reasons that follow, the court concludes that they are entitled to gap priority and thus the objections will be overruled.

## II. FACTS[1]

Petitioning creditors filed an involuntary petition under chapter 7[2] against Howrey LLP ("Debtor") on April 11, 2011 (the

_____

[1] The following discussion constitutes the court's findings of fact and conclusions of law. Fed. R. Bankr. P. 7052(a).

[2] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532.

-1-

1   "Petition Date").  A majority of its attorneys had left the firm

2   by then.  A few weeks prior, Debtor had dissolved and began

3   winding down its business.  Debtor voluntarily converted its case

4   to chapter 11, and an order for relief was entered on June 6, 2011

5   ("Conversion Date").

6       At all material times Debtor was a lessee or sublessee at

7   various locations.  Five landlords or sublessors (or their

8   assignees)(collectively "Landlords") filed claims based upon

9   Debtor's post-Conversion Date rejection of their leases or

10  subleases (the "leases").  The Landlords have included in their

11  claims, and asserted priority for, the rent accrued during the

12  period from the Petition Date to the Conversion Date (hereafter

13  the "Gap Claims").[3]

14      The Landlords, their respective leased premises, and the

15  amounts of their Gap Claims are as follows:

16

17

18

19      [3] What generally is referred to as the "gap" is that period
    of time after an involuntary bankruptcy case is filed and before
20  an order for relief is entered.  The basis for a gap claim is
    found in section 502(f) which provides as follows:
21
22      (f) In an involuntary case, a claim arising in the ordinary
        course of the debtor's business or financial affairs after
23      the commencement of the case but before the earlier of the
        appointment of a trustee and the order for relief shall be
24      determined as of the date such claim arises, and shall be
        allowed under subsection (a), (b), or (c) of this section or
25      disallowed under subsection (d) or (e) of this section, the
        same as if such claim had arisen before the date of the
26      filing of the petition.

27  11 U.S.C.A. § 502.

28

-2-

| Landlord | Premise | Claim # | GAP Claim |
|---|---|---|---|
| U.S. Bank National Association, as Trustee, (the "Trust") | South Hope Street Los Angeles, CA | 570-3 | $493,341.62 |
| 1875/1925 Century Park East Company ("Century Park East") | Century Park East Los Angeles, CA | 956-2 | $104,911.63 |
| Dewey & LeBoeuf LLP | University Avenue East Palo Alto, CA | 701-2 | $266,627 |
| The Irvine Company LLC ("TIC") | Irvine, CA | 618-1 | $321,604.41 |
| Knickerbocker Properties, Inc. XXXIII ("Knickbocker") | San Francisco, CA | 690-1 | $360,090.57 |

On June 22, 2015, the Official Committee of Unsecured Creditors (the "Committee") filed objections to the Gap Claims. Allan B. Diamond, the chapter 11 trustee, has joined the Committee's objections, but only as to The Trust, Century Park East and TIC.  The objections focus only on the assertion of statutory priority for the claims.[4]  The Committee does not challenge the amounts of the Gap Claims, which are based on the rent accrued during the gap period, calculated pursuant to the respective leases.  Nor has it objected to other portions of the Landlords' claims.

The objections came on for hearing on July 30, 2015.  After

---

[4]The objection to Knickerbocker's claim also includes a dispute over the amount claimed subsequent to the Conversion Date. Resolution of that portion of the objection has been deferred and is not relevant to the issue disposed of in this Memorandum Decision.

-3-

considering the arguments of counsel and the documentary evidence presented, the court rejects the Committee's theory that the Gap Claims arose at the time of execution of the respective leases and that the Gap Claims did not arise in the ordinary course of the Debtor's business after the Petition Date.   Accordingly, the court concludes that the Gap Claims are entitled to statutory priority under section 507(a)(3).[5]

III.   DISCUSSION

A.   When Did the Landlords' Gap Claims Arise?

The Committee argues that when the Debtor entered into the several leases at issue, the Gap Claims arose.  If this is so, then section 502(f) is of no help to the Landlords because it only applies to claims arising in the ordinary course of a debtor's business or financial affairs after the commencement of the case.

This cannot be the law, based both on policy and a fair reading of the Bankruptcy Code.  First, as a policy matter there is no hint that Congress meant to exclude landlords (or others who have ongoing contractual relationships with debtors when involuntary petitions in bankruptcy are filed against them).  Nor has the Committee cited any convincing authority for this extraordinary proposition.  Gap priority provides an inducement

---

[5] Section 507(a)(3) provides that after First and Second priority for allowed unsecured claims for domestic support obligations, etc., and administrative expenses allowed under section 503(b) and other sources, claims such as the Gap Claims are entitled to the next priority:

(3) Third, unsecured claims allowed under section 502(f) of this title.

11 U.S.C.A. § 507.

-4-

1  and a protection for parties who deal with involuntary debtors.

2  As one court noted:

3      Section 502(f) was intended to protect the creditors who deal
       with an involuntary debtor during the gap period, such as
4      <u>lessors</u>, trade creditors and similar parties, consistent with
       section 303(f)'s specific grant to the involuntary debtor to
5      conduct its business in ordinary fashion while its status is
       resolved. *See* S.Rep. No. 95-989, 95th Cong., 2d Sess. 65,
6      *reprinted in* 1978 U.S. Code Cong. & Admin. News 5787, 5851.

7  *In re Hanson Indus., Inc.*, 90 B.R. 405, 413 (Bankr. D. Minn.
8  1988)(emphasis added); *see also In re Manufacturer's Supply Co.*,
   132 B.R. 127, 129 (Bankr. N.D. Ohio 1991).

9

10     The Committee's argument, carried to its logical conclusion,

11 means landlords were excluded from this protected class, even

12 though they cannot discontinue their relationships with

13 involuntary debtors because of the automatic stay.[6]

14     There is another critical policy-based question lurking here

15 as well.  That is, what is a debtor to do when faced with giving

16 up defending an involuntary petition to cut off the accrual of

17 priority claims?  The short answer (other than simply to pay those

18 claims as they become due) is to assess promptly whether an order

19 for relief is inevitable and prompt rejection makes sense.  If

20 that is the case, a debtor would be well-advised not to fight, but

21     instead do what Debtor did here (but more quickly), viz.,

22

23     [6]As vigorously as some debtors may fight involuntary
   petitions and seek dismissal, they nevertheless enjoy the
   protection of section 362(a) while they battle.  See 11 U.S.C. ¶
24 362 ( "a petition filed under section 301, 302, <u>or 303</u> of this
   title ... operates as a stay") (emphasis added); *Gilchrist v. Gen.*
25 *Electric Capital Corp.*, 262 F.3d 295, 303 (4th Cir. 2001)
   (automatic stay commences upon filing of involuntary petition);
26 *Am. Nat'l Bank of Austin v. MortgageAmerica Corp. (In re*
   *MortgageAmerica Corp.)*, 714 F.2d 1266, 1273 (5th Cir. 1983)
27 (same); *Eldorado Canyon Properties, LLC v. Mantalvanos*, 515 B.R.
   852, 855 (M.D. Fla. 2014) (same); *In re E.D. Wilkins Grain Co.*,
28 235 B.R. 647 (Bankr. E.D. Cal. 1999) (same).

-5-

1  convert to a voluntary case and move to reject immediately.[7]  The
2  irony in this case is that Debtor was planning a voluntary chapter
3  11 in the District of Columbia when it was confronted with the
4  involuntary petition in this district.  Hindsight is cheap, but
5  clearly it should have done exactly that, preserving as it did
6  here (though later abandoned), its argument to seek to transfer
7  venue after the Conversion Date.

8      Turning to the Bankruptcy Code, the definition of "claim" in
9  section 101(5) is very expansive, extending to rights to payment
10  of money even when those rights are contingent or unmatured.
11  Still, when Debtor entered into the leases, regardless of how long
12  ago, no Landlord then had a claim for rent accruing during the gap
13  period.  Perhaps a breach of a lease by Debtor and a termination
14  of the lease by its landlord before the Petition Date would
15  necessarily require measuring the two month gap period as part of
16  the lost future rent calculation to determine the breach claim,
17  but that is not the situation here.  And although the Landlords'
18  claims include some pre-petition amounts, the only time rent
19  became due post-petition was, to state the obvious, when it became
20  due - during the gap period.  That is when the Gap Claims arose.

21      While the precise question of gap priority for landlords
22  claims may not have been addressed in other reported decisions,
23  some courts have come close and their views are consistent with
24  the result the court reaches here.  For example, in addressing

25

26      [7]Obviously the debtor who successfully defeats an involuntary
petition and obtains dismissal of the case has to pay the rent in
full, loses the benefit of the automatic stay and risks liability
27  for the full claims of landlords of leases that are later breached
and terminated, without the ability to limit those claims under
28  section 502(b)(6).

-6-

whether a landlord's gap claim was subject to the limits of
section 502(b)(6), a district court stated:

> Indeed, rent payments fall within the common
> understanding of ordinary course obligations, and the
> rent payments in dispute fall within the period ("gap
> period") identified by section 502(f). Hence, the claim
> falls squarely within section 502(f) and, therefore,
> "shall be allowed."

*New Valley v. Corp. Prop. Assoc. (In re New Valley Corp.*, 2000 WL
1251858 (D. N.J. Aug. 31, 2000) at *19.

The court in *In re CSVA, Inc.*, 140 B.R. 116 (Bankr. W.D.N.C.
(1993)) was faced with the question of whether landlords with
post-petition, pre-rejection administrative rent claims were
entitled to rent pursuant to their leases or were limited to the
storage value of their leased premises.  Because the case had
begun as an involuntary chapter 7, then eleven days later was
converted to chapter 11, then a month later was converted back to
chapter 7, there were three levels of priority:

> Thus, in the case now before the Court, the
> administrative claims incurred after the conversion to
> Chapter 7 on July 26, 1991 (the "Chapter 7
> Administrative Claims") have priority over the
> administrative claims incurred from June 25, 1991 to
> July 26, 1991 (the "Chapter 11 Administrative Claims"),
> which in turn have priority over claims arising during
> the gap period (the "Gap Period Administrative Claims").

*Id.* at 118.

Since the court had no information whether there were
sufficient assets to pay administrative claims in full, it made no
further analysis beyond the issue squarely presented.  Thus there
was no discussion of how to determine the amount of the gap claims

-7-

as presented to this court by the present objections.[8]

In rejecting a preference claim, the Ninth Circuit Bankruptcy Appellate Panel held that lease payment obligations arise when they become due and payable because of the contemporaneous manner in which money and services are exchanged and the facile divisibility of the separate rent payments. As a rule, payments apply specifically to the period in which they are paid. *In re Upstairs Gallery, Inc.,* 167 B.R. 915, 918 (9th Cir. BAP 1994). *See also In re Clothes, Inc.*, 35 B.R. 489 (Bankr. D. N.D. 1983 (The lessee becomes obligated each month as the rent comes due; in return, the lessor becomes obligated to provide the leasehold).

The Committee also argues that section 502(g)(1) controls here.[9] That argument is not persuasive. The statute deals with the treatment a claim "arising from the rejection." Here the Gap Claims arose from the Debtor's continued right to use the premises and its failure to pay the gap rent, not the subsequent rejection. The trustee (or was the case here, the debtor in possession), was

---

[8]Some Landlords also cite to *In re Joan Cook, Inc.*, 1993 WL 190589 (Bankr. S.D. Fla, May 14, 1993) and *In re McLean Enterprises, Inc.,* 105 B.R. 928 *(*Bankr. W.D. Mo. 1989*)* but those cases deal principally with the cap on lease rejection damage claims under section 502(b)(6) and are not helpful here.

[9]"A claim arising from the rejection, under section 365 of this title or under a plan under chapter 9, 11, 12, or 13 of this title, of an executory contract or unexpired lease of the debtor that has not been assumed shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section or disallowed under subsection (d) or (e) of this section, the same as if such claim had arisen before the date of the filing of the petition."

11 U.S.C. § 502(g)(1).

-8-

1  obligated under section 365 to perform obligations; this duty
2  began with the order for relief (i.e. on the Conversion Date) and
3  not before.

4      The Committee cites several cases, many from the Ninth
5  Circuit, for the general proposition that claims arising from pre-
6  petition events or damages upon rejection lead to pre-petition,
7  non-priority general unsecured claims.[10]   None of the cases relied
8  upon involved section 502(f) or involuntary cases.   Rather, the
9  courts focused on whether a particular debt "arose" pre-petition
10 or post-petition for the purposes of receiving administrative
11 priority under section 503(b).   As gap claims are not entitled to
12 administrative priority under section 503(b) in any event, the
13 cases and analyses are irrelevant.

14     Finally, the Committee argues that the "obligations" to be
15 performed under section 365(d)(3) are different from the "claims
16 arising" under section 502(f).   The court understands the canons
17 of statutory interpretation and agrees that "claims" and
18 "obligations" have different meanings but that does not change the
19 result.   The failure to perform an obligation as required by
20 section 365(d)(3) does not necessarily give rise to a claim
21 because it may not give rise to a right to a payment of money.
22 Leases frequently contain numerous non-monetary obligations.
23 Payment of rent is one of many obligations to be performed and the

24

25     [10]*In re Abercrombie,* 139 F.3d 755, 756 (9th Cir. 1998), *In re
   Oxford Mgmt., Inc.,* 4 F.3d 1329 (5th Cir. 1993), *In re
26 Westmoreland Coal Co.,* 213 B.R. 1, 14 (Bankr. D. Colo. 1997), *SNTL
   Corp. v. Centre Ins. Co. (In re SNTL Corp.),* 571 F.3d 826, 843–44
27 (9th Cir. 2009), *In re BCE West, L.P.,* 319 F.3d 1166, 1173 (9th
   Cir. 2003), *Christian Life Ctr. Litig. Def. Comm. v. Silva (In re
28 Christian Life Ctr.),* 821 F.2d 1370, 1374 (9th Cir. 1987).

-9-

Case3:15-cv-03959-JD Document1-1 Filed08/28/15 Page10 of 11

1  failure to perform that obligation gives rise to the Landlord's

2  right to be paid their Gap Claims.

3      B.   Were the Landlords' Gap Claims Incurred in the Ordinary
4  Course of Debtor's Business or Financial Affairs?

5      As an alternative argument, the Committee stresses that

6  Debtor was winding down by the Petition Date, having already left

7  some premises, large numbers of employees or partner already gone,

8  and the liquidation well underway.  Thus, the argument goes, the

9  Gap Claims arose under circumstances that were wholly unlike the

10  Debtor's normal business, that of a large, national law firm.[11]

11  For this same reason, the Committee discounts the fact that some

12  of the Landlords point to disputed facts as to when and whether

13  Debtor vacated or surrendered the premises and whether personal

14  property was left behind.[12]

15      The court rejects this argument.  All of the leases were

16  entered into as part of Debtor's normal business, and it is

17  normal, or "in the ordinary course of the debtor's business" for

18  the Landlords to have a "right to payment" - a claim under section

19  101(5)(A) - as the occupancy continues.   Stated otherwise, the

20

21      [11]On the Conversion Date Debtor moved reject several leases,
    including all those of the Landlords'.  While one sentence in the
22  motion perhaps is not fatal to the Committee's argument four years
    later, the court cannot ignore the following statement in the
23  rejection motion (Dkt. No. 63, at 3):

24      Following the Petition Date, through the date of
        entry of the Order for Relief ("Gap Period"), the Debtor
25      continued <u>to operate its business in accordance with §
        303(f)</u> of the Bankruptcy Code. (Emphasis added)
26

27      [12]The court agrees with the Committee that it does not matter,
    but for a different reason: the rent was due as part of the
28  Debtor's business regardless of the situation at any particular
    leased premise.

-10-

focus is on the circumstances under which the right to payment of current rent "arises", which is when the occupancy continues, when the status quo vis-a-vis the Landlords continues.  *See also In re New Valley Corp.*, 2000 WL 1251858 at *19.

The Committee's argument, to prevail, would have court insert into section 502(f) the following change:

> In an involuntary case, a claim arising in the ordinary course of the debtor's business <u>except when the debtor has begun to liquidate its business</u>....

That is not the law.  Had Debtor affirmatively abandoned its leased premises and agreed to relief from the automatic stay so the Landlords could terminate the leases and gain possession of them the result might be different.  That would likely be such a departure from the normal landlord-tenant relationship that any claim for gap rent would have been extraordinary and not entitled to priority.

The Gap Claims arose in the ordinary course of the Debtor's business and therefore are entitled to priority.

IV. DISPOSITION

The court is concurrently issuing orders overruling the objections to the Landlords' claims for the reasons stated in this Memorandum Decision.

* * * END OF MEMORANDUM DECISION * * *

-11-